IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKEL RAY MORGAN, | No. C 10-05377 EJD (PR) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |
| vs. | |
| BRENDA M. CASH, Warden, | |
| Respondent. | |

Petitioner has filed a <u>pro se</u> petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state conviction. The Court found that Petitioner had raised three cognizable claims for federal habeas relief, and ordered Respondent to show cause why the writ should not be granted. Respondent filed an answer addressing the merits of the petition, and Petitioner filed a traverse. Having reviewed the papers and the underlying record, the Court concludes that Petitioner is not entitled to federal habeas corpus relief and will deny the petition.

**BACKGROUND**

Petitioner was found guilty by a jury in Contra Costa County Superior Court of first degree murder. Petitioner was sentenced to fifty-one years to life in state

prison on April 11, 2008. Petitioner appealed his conviction, with the state high court denying review. Petitioner filed the instant federal petition on November 29, 2010.

## FACTUAL BACKGROUND

The following facts are taken from the opinion of the California Court of Appeal:

*The Incident*

> On June 18, 2007, [Petitioner's] cousin, Cecil Walker, was at his apartment on Trigger Road in Rodeo when he heard noise behind the apartment complex. He walked outside and saw [Petitioner] playing dice behind the complex with several people, including Corey "Corndog" Tidwell. [FN2]
>
> > FN2. [Petitioner's] nickname is "Boo." There were at least two other men playing dice that day, including Steve and "Ant."
>
> Walker saw [Petitioner] pull a gun from his waist and point it at Tidwell. Walker heard gunshots; then Tidwell yelled, "Quit, Boo" and "Don't do it. Don't Do it, not me." Walker ran away because he was "[a]fraid of shots being fired and one hit[ting] [him]." He did not have a gun and did not shoot Tidwell. During an interview with Detective Michelle Day, Walker initially lied about witnessing the incident because he feared being perceived as a "snitch." Walker eventually told Day what he saw. At trial, Walker admitted being a convicted felon and receiving immunity for his testimony.
>
> On the day of the incident, 12-year-old Eli. was at her friend Michelle's residence at the apartment complex on Trigger Road when she saw a Black man behind the complex. The man was pointing a gun at Tidwell. Tidwell ran and Eli. heard one or two gunshots. Tidwell slipped and fell to the ground; the man ran up to him and shot him several times. Then he took money from Tidwell's wallet and ran. The man was about six feet tall and wore his hair in eye-level dreadlocks. Detective Day showed Eli. a picture of [Petitioner] and she recognized him as the person who shot Tidwell. She also told Day, however, that [Petitioner] "[k]ind of" looked like the man who shot Tidwell. Eli. was not able to identify [Petitioner] at trial and conceded she did not want to testify because she was scared. Eli. did testify, however, that Walker did not shoot Tidwell.
>
> Michelle was at the apartment complex with Eli. when she heard four or five gunshots. She looked out her apartment window and saw Tidwell on the ground; then she saw a man run up to Tidwell and start shooting at him. The shooter went through Tidwell's pockets and ran toward the back of the apartment complex.

Michelle did not get a good look at the shooter's face, but she saw he was a light-skinned Black man. She thought the shooter had "a little bit of hair" but not dreads or "twisties." Michelle was not able to identify the shooter when she spoke to police after the incident.

Brittany Tozier-Ricketts was in her apartment when she heard "fire cracker sounds." She looked out her front door and saw three men, one of whom had a gun in his hand. She saw the victim run and the man with the gun shoot in the victim's direction. The third man – who did not have a gun – run along a path between two buildings. At that point, the shooter "fire[d] off a couple more rounds[.]" Ricketts was unable to see more because her mother-in-law and sister-in-law blocked her view.

According to Ricketts, the shooter was Black, had a [l]ight to medium" skin tone, and was wearing a white t-shirt and jeans. He had short hair that "looked like it was shaved closely to the head." Ricketts did not pay much attention to the shooter's hair, but she remembered it "looked kind of short" and was not braided. Ricketts did not get a good look at the shooter's face and was unable to identify him in a photo lineup. At trial, Ricketts testified that although she could not be sure, [Petitioner] looked similar to the shooter because of his hair, skin tone, and build.

Rickett's mother-in-law, LyndaTozier, was also in her apartment when she heard what she thought were fire crackers. Tozier called 911 and ran outside. She saw Walker in the parking lot, running towards his apartment. He did not have a gun in his hands. She also saw another man "running around back of the apartments." She did not see the other man's face or hands but she noticed he was wearing a white t-shirt and jeans and had a "close-shaved" hairstyle. After the two men ran away, Tozier walked toward the victim's body and noticed he was "already deceased."

Tozier's daughter, Chartina, saw a Black man shoot at Tidwell, go through his pockets, and run away. Chartina did not get a good look at the shooter's face, but she noticed he was between 5'9" and 6 feet tall, had a relatively slender build, and had a short, clean-cut hairstyle. The shooter did not have dreadlocks or "twisties." The shooter had a medium skin tone and wore a white t-shirt and jeans. At trial, Chartina testified that [Petitioner]'s skin tone, hair, and height looked similar to the shooter's.

Tidwell's stepson saw several people, including [Petitioner] and Tidwell, playing a game of dice on the day of the incident. [Petitioner] was wearing blue jeans and a white t-shirt and wore his hair in "twisties" which hung down to his earlobes.

*The Investigation*

Detective Day investigated the incident. She determined [Petitioner] was 25 years old, 5'9," and weighed approximately 165 pounds. [Petitioner] had "short hair, possibly cornrows.. [with] some little braids hanging down" a few inches below his ears. Day showed Eli. a photo lineup; when Eli. saw [Petitioner]'s picture, she gasped,

"her eyes got big, and she nodded her head up and down in a yes motion." Eli. said she saw [Petitioner] at the YMCA earlier that week and again on the day of the incident, "'[w]hen he shot'" Tidwell. Eli. also said [Petitioner] had "short dreads" on the day of the incident. She told Day, however, she could not be completely sure [Petitioner] was the person who shot Tidwell because a lot of people in the neighborhood look alike. Police found the handgun used during the incident but were unable to locate any fingerprints or DNA on it.

*Marquita Wallace's Refusal to Testify*

The People advised the court they intended to call Wallace, [Petitioner]'s girlfriend, as a witness at trial. They sought – and obtained – a subpoena on the grounds that she was a material witness because she told police [Petitioner] confessed to the shooting. The police located Wallace and kept her on house arrest until trial.

Before trial, defense counsel filed a motion in limine asking the court to "resolve the prosecution's primary witness, Marquita Wallace's issue on whether she will exercise her Fifth Amendment right and not testify, whether the prosecution will grant her immunity or whether she will refuse to comply with any court order compelling her to testify." Defense counsel contended that if Wallace chose not to testify, "any and all previous statements [she] made to police concerning [Petitioner]'s involvement [in the incident] should be excluded as a violation of his Sixth Amendment Right and Due process rights to confront... witnesses against him[.]"

At the hearing on the motion, Wallace's counsel informed the court that if called to testify, Wallace would invoke her privilege against self-incrimination because of a pending felony charge. The court advised the parties that if Wallace asserted the privilege, it would permit the prosecution to offer Wallace immunity. If the prosecution offered Wallace immunity, then "she'll be given that [immunity] and instructed to answer the questions. We'll bring in the jury. We'll have her asked questions and see what she does." If Wallace continued to refuse to answer, the court stated it would "order [her] to answer... with the penalty of possibly being held in contempt, and we'll see what she does, and then we'll go from there."

During trial, Wallace informed the court she would refuse to testify even if the prosecutor granted her use immunity. After the prosecutor agreed to grant Wallace immunity, the court ordered her to testify. Wallace took the witness stand and testified she was [Petitioner]'s girlfriend and the mother of his child. Wallace stated she lived with [Petitioner] when the incident occurred. When the prosecutor asked Wallace whether she knew a man named Victor Campbell, she responded, "I ain't answering it." After the court ordered Wallace to answer the question, she admitted Campbell was her cousin and that he spent time with [Petitioner]. Wallace also testified Campbell did not come to her house on the day of the shooting and that [Petitioner] did not tell her he and Campbell were going to Walker's house.

When Wallace stated she did not recall talking to the police after the incident, the prosecutor showed Wallace a statement she made to police to refresh her recollection. Wallace said the statement did not refresh her recollection, and the following colloquy occurred:

"PROSECUTOR: Okay. Didn't you tell the police, Ms. Wallace, that [ ] Campbell came over to your house on the day of Tidwell's shooting? You told that to the police, didn't you?

"WALLACE: No, I did not.

"PROSECUTOR: And you told the police, didn't you, Ms. Wallace, that [ ] the defendant, the father of your child, told you that he and Campbell were going to go over to his cousin's, [Walker's] house that day?

"WALLACE: No.

"PROSECUTOR: You never told that to the police?

"WALLACE: No.

"PROSECUTOR: You, in fact, were not happy about the defendant going over to [ ] Walker's house with [Campbell], were you?"

Wallace asked to speak with her lawyer. After she did, the prosecutor continued questioning her.

"PROSECUTOR: You weren't happy, Ms. Wallace, that [Petitioner]... was going over to Cecil Walker's house with Mr. Campbell, were you? ¶...

"WALLACE: Not answering it... ¶...

"PROSECUTOR: Okay, you weren't happy, Ms. Wallace, that [Petitioner] was going over to Cecil Walker's houe with Mr. Campbell, were you?

"WALLACE: Not answering it. I refuse to answer.

"PROSECUTOR: Did the defendant tell you he shot [Tidwell]?

"WALLACE: Not answering it.

"PROSECUTOR: Did he tell you that he shot him in the hand? Did he tell you that he shot [Tidwell] in the hand, Ms. Wallace?"

At that point, counsel for Wallace objected that the prosecutor was badgering the witness. The court overruled the objection and ordered Wallace to answer the question. The prosecutor then asked:

"PROSECUTOR: Did the defendant tell you that after he shot

[Tidwell] in the hand that the victim then said, 'No man, don't shoot me, don't shoot me, don't shoot me.' Did he tell you that?...

"WALLACE: (No response.)

"THE COURT: Ms. Wallace, I'm going to order that you answer that question or you'll be held in contempt.

"WALLACE: I'm not answering it.

"THE PROSECUTOR: Did the defendant tell you that he then shot him four more times? Did he tell you that he then shot [Tidwell] four more times?"

The court overruled defense counsel's due process and confrontation clause objections and ordered Wallace to answer the question. She refused and, outside the presence of the jury, the court held her in contempt.

Later in the trial, defense counsel moved to strike Wallace's testimony. The court granted the motion and struck Wallace's testimony. It permitted the prosecutor, however, to argue the jury could infer from Wallace's refusal to testify that she was "doing it to cover up for the defendant[.]" The court explained the prosecutor could "argue the inference that her refusing to testify with no legal right to do so, is she's doing it on behalf of – she has a motive to protect [Petitioner]." The court, however, precluded the prosecutor from "discuss[ing] specific testimony" because defense counsel " never had an opportunity to cross [examine Wallace]." Defense counsel did not object to the court's ruling.

*Closing Argument*

Before closing argument, the court informed the jury it was striking Wallace's testimony "entirely." During his rebuttal argument, the prosecutor noted the "overwhelming impact of Marquita Wallace and her significance in this case. [¶] Marquita Wallace refused to testify, and you can consider that... And.. the only reasonable interpretation... [is] that she is protecting the defendant. And you can consider that. And you are entitled to consider that. You can. [¶] The smoke screen that was put up by the defense... is just parted when one looks at all of the evidence, every witness, and then Marquita Wallace as well, who is clearly, based upon the evidence, and the reasonable interpretation, the only thing she's protecting him by refusing to testify and simply answer basic questions[.]" The prosecutor then commented, "the issue is protecting from what? Protecting from conviction. Because in this case the defendant, in fact, committed the murder." Defense counsel did not object. [FN4]

> FN4. At trial, the court admitted an audiotape and transcript of [Petitioner]'s jailhouse conversation where [Petitioner] spoke to another man and told him "mum's the word," and that a man named "Super Dog" needed to "hit his mute button." [Petitioner] then stated Super Dog was planning to

Order Denying Petition; Denying Certificate of Appealabilty
G:\PRO-SE\SJ.EJD\HC.10\Morgain05377_denyHC.wpd        6

> "be there Thursday" and asked whether anyone had visited Super Dog or spoken to him. During closing argument, the prosecutor urged the jury to conclude [Petitioner] was referring to Walker during the conversation. At trial, Walker denied having a nickname and none of the testifying witnesses referred to him as "Super Dog."
>
> After deliberating for three days and requesting readback of certain testimony, the jury convicted [Petitioner] of first degree murder. The court sentenced [Petitioner] to 51 years to life in state prison with 248 days of presentence custody credit.

People v. Morgain, No. A121530, slip op. at 2-8 (Cal. Ct. App. Sept. 4, 2009) (Ans. Ex. 2).

## DISCUSSION

I.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the

Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court considering petitioner's claims, the court "looks through" to the last reasoned opinion. See Ylst, 501 U.S. at 805; Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, an independent

Case5:10-cv-05377-EJD Document15 Filed10/17/12 Page9 of 19

review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

In three decisions issued in recent past terms, the Supreme Court vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783–85 (2011); Premo v. Moore, 131 S. Ct. 733, 739–40 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Felkner, 131 S. Ct. at 1307 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

C. Claims and Analysis

As grounds for federal habeas relief, Petitioner claims the following: (1) the trial court violated Petitioner's rights to confrontation and due process by permitting the prosecutor to question a witness about statements which were inadmissible under Crawford v. Washington, 541 U.S. 36 (2004); (2) the trial court violated Petitioner's right to confrontation when it allowed the prosecutor to argue negative inferences from a witness's refusal to testify; and (3) cumulative error. (Pet. at 4(a).)

1. Right to Confrontation

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI.[1] The ultimate goal of the Confrontation Clause is to ensure

---

[1] The federal confrontation right applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965).

G:\PRO-SE\SJ.EJD\HC.10\Morgain05377_denyHC.wpd       9

reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. Id.; see Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination). The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. Crawford, 541 U.S. at 61; see, e.g., United States v. Medjuck, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses.); Wood v. Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross examine adverse witnesses and to present relevant evidence).[2]

The Confrontation Clause applies to all "testimonial" statements. See Crawford, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (internal quotation and citation omitted); see id. ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. Crawford, 541 U.S. at 50-51.

Confrontation Clause claims are subject to harmless error analysis. United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case); see also United States v. Allen, 425 F.3d 1231,1235 (9th Cir. 2005). For purposes of federal

---

[2] Cross-examination includes the right to show the witness's possible bias or self interest in testifying. See Chipman v. Mercer, 628 F.2d 528, 530 (9th Cir. 1980); Skinner v. Cardwell, 564 F.2d 1381, 1388-89 (9th Cir. 1977), cert. denied, 435 U.S. 1009 (1978).

habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. See Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); Webb v. Lewis, 44 F.3d 1387, 1393 (same).

### a. Questioning of Wallace

Petitioner claims that the trial court violated his rights to confrontation and due process by permitting the prosecutor to continue to question Wallace in front of the jury even after she refused to testify, specifically on whether she told police that Petitioner had confessed to the shooting. The court granted defense counsel's motion to strike the testimony, and the jury was instructed to disregard the testimony and not consider it for any purpose. See supra at 6.

The state appellate court summarized Petitioner's reliance on Douglas v. Alabama, 380 U.S. 415 (1965), in support of his claim.

> Relying on *Douglas*, [Petitioner] contends the prosecutor's questions of Wallace "introduced devastating evidence about [his] involvement in the shooting." In *Douglas*, the defendant and another man, Loyd, were charged with assault with intent to murder. (*Douglas*, *supra*, 380 U.S. at p. 416.) The state tried Loyd first and a jury convicted him. The prosecutor called Loyd as a witness at the defendant's trial, but he asserted the Fifth Amendment and refused to answer questions about the incident. (*Ibid.*)
>
> While questioning Loyd, the prosecutor read a confession Loyd allegedly made to the police wherein he inculpated the defendant. (*Douglas*, *supra*, 380 U.S. at p. 416.) "Under the guise of cross-examination to refresh Loyd's recollection, the [prosecutor] purported to read from the document, pausing after every few sentences to ask Loyd, in the presence of the jury, 'Did you make that statement?' Each time, Loyd asserted th privilege and refused to answer, but the [prosecutor] continued this form of questioning until the entire document had been read." (*Id.* at pp. 416-417, fn. omitted.) The statements the prosecutor read from the document "recited in considerable detail the circumstances leading to and surrounding the alleged crime; of crucial importance, they named the [defendant] as the person who fired the shotgun blast which wounded the victim." (*Id.* at p. 417, fn. omitted.)
>
> The United States Supreme Court reversed the conviction. It held the defendant's inability to cross-examine Loyd about the alleged confession denied him "the right of cross examination

secured by the Confrontation Clause." (*Douglas*, *supra*, 380 U.S. at p. 419.) As the high court explained, "Loyd's alleged statement that the [defendant] fired the shotgun constituted the only direct evidence that he had done so; coupled with the description of the circumstances surrounding the shooting, this formed a crucial link in the proof of both petitioner's act and of the requisite intent to murder. Although the [prosecutor's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true." (*Ibid.*)

(Ans. Ex. 2 at 9-10.)

Petitioner also relied on People v. Shipe, 49 Cal.App.3d 343, 355 (1975), to support his argument that the prosecutor's questioning of Wallace violated his right to confrontation.

> . . .In *Shipe*, the police arrested the defendant and two other men for murdering a drug dealer. (*Id.* at pp. 345-346.) When the police arrested the defendant, he had a knife wound on his hand. (*Id.* at p. 345.) After the two other men pleaded guilty to being accessories after the fact, the prosecutor called them as witnesses at the defendant's trial. Each man answered some preliminary questions but asserted the Fifth Amendment when the prosecutor began asking questions about the incident. (*Id.* at p. 346.)
>
> The court determined the witnesses did not have the right to assert the privilege and ordered them to answer. The prosecutor then asked one witness a series of 17 questions about the incident, including "'It is not true that... you came back and saw the body of [the victim] and that [defendant] was on top of him?'" and "Is it not true that you saw [the defendant] remove the wallet of [the victim] and take the knife with him?'" (*Shipe*, *supra*, 49 Cal.App.3d at p. 347.) The prosecutor asked the second witness several questions, including "Is it not further true... that in your presence [the victim] was stabbed multiple times by your brother, [the defendant]?" (*Id.* at p. 348.) Through these leading question, "the prosecutor placed before the jury information which overwhelmingly established [the defendant] as the murderer, provided a narcotics-related motive for the crime, and provided a basis for the inference that two witnesses had revealed this information in their statements to the authorities." (*People v. Burciago* (1978) 81 Cal.App.3d 151, 164.)
>
> The *Shipe* court reversed the conviction and held the prosecutor's questions violated the defendant's right of confrontation. (*Shipe*, *supra*, 49 Cal.App.3d at pp. 349, 355.) The court characterized the prosecutor's questions as "flagrantly suggestive" and noted a prosecutor may not, "under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony." (*Id.* at pp. 349, 351.) Finally, the court

       concluded the People could not demonstrate beyond a reasonable doubt that the violation of the defendant's right of confrontation did not contribute to the verdict because the evidence of the defendant's guilt was "entirely circumstantial." (*Id*. at p. 355.)

(Ans. Ex. 2 at 10-11.)

The state appellate court ultimately rejected Petitioner's claim:

> *Douglas* and *Shipe* are distinguishable. In those cases, the defendant did not move to strike either the witness's nonresponsive testimony or the prosecutor's leading questions. Here, the court struck Wallace's testimony and instructed the jury not to consider the prosecution's questions as evidence. "The assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." (*Tennessee v. Street* (1985) 471 U.S. 409, 415, fn. 6; see also *People v. Smithey* (1999) 20 Cal.4th 936, 962 [distinguishing *Douglas* where the jury was instructed to disregard all improper questions and "any answers that may have been given"].)
>
> Finally – in stark contrast to both *Shipe* and *Douglas* – there was independent evidence of [Petitioner]'s guilt. As noted above, Walker testified he saw [Petitioner] point a gun at Tidwell. He also testified he heard gunshots and Tidwell pleading with [Petitioner] not to shoot him. And several witnesses provided descriptions of the shooter that matched [Petitioner]'s description. The questions the prosecutor posed, therefore, were not the "only direct evidence" that [Petitioner] shot Tidwell. (Cf. *Douglas*, *supra*, 380 U.S. at p. 419.) Accordingly, neither *Douglas* nor *Shipe* apply here and we conclude [Petitioner] was not denied his right of confrontation.

(Ans. Ex. 2 at 11.)

       Petitioner's reliance on <u>Douglas</u> and <u>Shipe</u> is clearly misplaced. The state appellate court properly distinguished <u>Douglas</u> and <u>Shipe</u> from Petitioner's case in determining that his right to confrontation was not violated. The Supreme Court overturned the conviction in <u>Douglas</u> because the testimony at issue was the only direct evidence of the defendant's culpability. <u>See</u> <u>supra</u> at 11-12. The <u>Shipe</u> court also overturned the conviction because it found that the prosecutor's leading questions resulted in the jury hearing what was "tantamount to devastating direct testimony" and the evidence of defendant's guilt was otherwise "entirely circumstantial." <u>Id.</u> at 12. In Petitioner's case, Wallace's testimony was not the only direct evidence of Petitioner's guilt; there was other independent evidence

connecting Petitioner with the shooting, including several eye-witness accounts. Furthermore, the juries in Douglas and Shipe were permitted to consider the testimonies at issue in their deliberations while the trial court in Petitioner's case struck Wallace's testimony entirely and instructed the jury not to consider it for any purpose.

Even if we assumed that the trial court erred in permitting the prosecution to question Wallace after she refused to testify, the error was harmless. First of all, the jury was instructed to disregard the testimony and not to consider it for any purpose. See Weeks v. Angelone, 528 U.S. 225, 235 (2000) (stating that jurors are presumed to follow the court's instructions). Furthermore, there was other direct evidence of Petitioner's guilt: (1) his cousin Walker identified Petitioner as the shooter; (2) Eli. identified Petitioner as the shooter; and (3) several other witnesses who saw the shooting provided descriptions of the shooter that closely matched Petitioner. See supra at 2-3. Based on the court's instructions to the jury and the other independent evidence of Petitioner's guilt, Petitioner cannot show that the inadmissible evidence had an actual and prejudicial effect upon the jury. See Hernandez, 282 F.3d at 1144. Accordingly, the state courts' rejection of this claim was not contrary to, nor an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d). Petitioner's claim is without merit and does not warrant habeas relief.

With respect to Petitioner's due process claim, Respondent argues that no clearly established Supreme Court law provides that admission of a witness' testimony, who is likely to refuse to testify, violates due process. (Ans. at 17.) In his traverse, Petitioner expands on his due process claim and asserts that the Fourteenth Amendment guarantees him a fair opportunity to defend against the state's accusations and that Wallace's questioning before the jury violated that right. (Trav. at 12-13.) A violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict. Jackson v. Nevada, 688 F.3d 1091, 1104 (9th Cir. 2012) (citing Brecht v.

1  Abrahamson, 507 U.S. 619 (1993)).  As discussed above, any error was harmless in
2  light of the fact that the jury was instructed to disregard Wallace's testimony and
3  that there was substantial independent evidence of Petitioner's guilt.  Accordingly,
4  Petitioner's due process claim is without merit.

          b.         Prosecutor's Closing Statement

Petitioner's second claim is that the trial court violated his right to confrontation when it allowed the prosecutor to argue negative inferences from Wallace's refusal to testify.  At trial, the judge granted defense counsel's motion to strike the testimony from the record and prohibited the prosecutor from discussing Wallace's specific testimony.  However, the prosecutor was permitted to argue in closing reasonable inferences from Wallace's refusal to testify, *i.e.*, that she did so to protect Petitioner.  See supra at 6.

The California Court of Appeal rejected this claim:

> Distilled to its essence, [Petitioner]'s real complaint seems to be that the court erred by allowing the prosecutor to argue an inference from Wallace's refusal to testify because the court had stricken all of her testimony. Put another way, [Petitioner] suggests there was no evidentiary basis for a negative inference because the court struck all of Wallace's testimony, including her refusal – without legal justification – to answer the prosecutor's questions. We disagree. To be sure, the court struck Wallace's testimony. But it did not strike the fact that she took the witness stand and refused to testify. The act of her unjustified refusal to answer the prosecutor's questions remained before the jury. Accordingly, the court did not err by allowing the prosecutor to argue a negative inference from Wallace's initial willingness to answer questions and her subsequent and unjustified refusal to answer questions about the incident.
>
> Even if we were to assume the court erred by permitting adverse comment after striking all of Wallace's testimony, we could find the error harmless. (*Chapman v. California* (1967) 386 U.S. 18, 20-21.) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" (*Neder v. United States* (1999) 527 U.S. 1, 18, criticized on other grounds in *People v. McCall* (2004) 32 Cal.4th 175, 187, fn. 14.)
>
> At trial, Walker testified he saw [Petitioner] point a gun at Tidwell and heard Tidwell yell, "Quit, Boo" and "Don't do it. Don't do it, not me" as shots were fired. Eli. saw a Black man shoot Tidwell and then take money form his wallet. When Detective Day showed Eli. a picture of [Petitioner], Eli. recognized him as the

> shooter. And although she did not identify [Petitioner] at trial and conceded she did not want to testify because she was scared, she stated Walker did not shoot Tidwell. [FN5] Tozier also testified Walker did not have a gun.
>
>> FN5. [Petitioner] makes much of the fact that certain witnesses stated the shooter did not have dreadlocks or twisties. But these witnesses all conceded they did not get a good look at the shooter's face and were not able to identify the shooter either in a photo lineup or at trial. But Walker and Eli., both of whom saw [Petitioner] either pointing a gun at Tidwell or shooting him, testified [Petitioner] wore his hair in cornrows or twistees, which matched the description of [Petitioner] given by Detective Day. In addition, Chartina, Tozier's daughter, testified that [Petitioner]'s skin tone, hair, and height looked similar to the shooter's.
>
> Moreover, the court instructed the jury that the attorney's arguments were not evidence and that it could not consider stricken testimony for any purpose. "'"[It is] the almost invariable assumption of the law that jurors follow their instructions." [Citation.] "[We] assume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." [Citations.]'" (*Sisneros*, *supra*, 174 Cal.App.4th at pp. 152-153, citing *United States v. Olano* (1993) 507 U.S. 725, 740.)
>
> In light of this evidence, we conclude the error was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)

(Ans. Ex. 2 at 14-15.)

For the same reasons that Petitioner's first Confrontation Claim was denied as without merit, his second claim attacking the prosecutor's use of negative inferences must also be denied because any error was harmless. The jury is presumed to follow the court's instructions that the attorney's arguments were not evidence and that it could not consider stricken testimony for any purpose. See Angelone, 528 U.S. at 235. Furthermore, there was other direct evidence of Petitioner's guilt, *i.e.*, the eye witness testimony of Petitioner's cousin Walker and Eli. identifying Petitioner as the shooter. Furthermore, other witnesses' descriptions of the shooter matched Petitioner's appearance. See supra at 3. Accordingly, the state courts' rejection of this claim was not contrary to, nor an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d).

///

### 2. Cumulative Error

Petitioner's last claim is that he is entitled to habeas relief based on the cumulative effect of the two alleged state court errors. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. See, e.g., Alcala v. Woodford, 334 F.3d 862, 893-895 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

Here, Petitioner has not demonstrated that there was even one constitutional error. Petitioner may disagree with the decisions of the state courts, but he has not shown that they were unreasonable under clearly established federal law. Accordingly, his claim of cumulative error must be denied.

## CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the petition for a writ of habeas corpus must be DENIED.

Further, a certificate of appealability is DENIED. See Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the

Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions as moot, enter judgment in favor of Respondent and close the file.

DATED: 10/17/2012

									_____
									EDWARD J. DAVILA
									United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

MARKEL RAY MORGAIN,

        Petitioner,

v.

BRENDA M. CASH, Warden,

        Respondent.

Case Number: CV10-05377 EJD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on 10/17/2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Markel Ray Morgain G-16401
CA State Prison-Los Angeles County
P.O. Box 8457
Lancaster, CA 93539-8457

Dated: 10/17/2012

Richard W. Wieking, Clerk
/s/ By: Elizabeth Garcia, Deputy Clerk